### Illinois Steel Company v. John D. Paige, Administrator.

#### Gen. No. 4,834.

1. ARGUMENTS OF COUNSEL—*when propriety of, not subject to review.* Where no objection or exception is preserved, the propriety of arguments of counsel are not subject to review.

2. DEGREE OF CARE—*required in moments of extreme peril.* Persons in imminent peril are not required by law to exercise all the presence of mind and care which a prudent and careful man would exercise under ordinary circumstances.

3. VERDICT—*when not excessive.* A verdict for $6,000 rendered in an action for death caused by alleged wrongful act is not excessive where it appears that the plaintiff's intestate was twenty-four years of age, of good health, exemplary habits and bright prospects, and had in his lifetime contributed to the support of his parents and their family since he was of the age of sixteen years.

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of Will County; the Hon. DORRANCE DIBELL, Judge, presiding. Heard in this court at the April term, 1907. Affirmed. Opinion filed October 10, 1907.

JOHN H. GARNSEY, for appellant; KNAPP, HAYNIE & CAMPBELL, of counsel.

DONAHOE, MCNAUGHTON & MCKEOWN, for appellee.

MR. PRESIDING JUSTICE WILLIS delivered the opinion of the court.

This was an action on the case brought by John D. Paige, administrator of the estate of Jay D. Paige, deceased, against the Illinois Steel Company, to recover damages for the loss of support by the next of kin of deceased, who died from injuries sustained while employed in the company's mixer mill at Joliet, Illinois. Appellee recovered a verdict and a judgment for $6,000 from which defendant below appeals.

The declaration originally contained seven counts, each alleging that, on the 15th day of September, 1906, appellant was engaged in the manufacture of iron and steel products and was possessed of certain buildings, tools and appliances, and that deceased was employed as a weigher of molten metal in its mixer mill; and that, while in the exercise of due care for his own safety he was precipitated into molten metal, causing injuries from which he afterward died; and that he left surviving him his father, mother and seven brothers and sisters, all of whom sustained pecuniary loss by reason of his death. The court directed the jury to disregard the third and fifth counts. The negligence charged in the first count was appellant's failure to furnish deceased with a reasonably safe place in which to work. The same was charged in the second, with the additional averment of failure to furnish a reasonably safe avenue or means of escape in the event that molten metal should be spilled. The charge in the fourth was appellant's failure to keep in repair the buildings and appliances in the mixer mill; that in the sixth was the employment of a servant habitually careless and physically incompetent to adjust certain hooks to elevate the ladles; and that in the seventh, a failure to furnish sufficient light to enable the "hooker on" to properly adjust the hooks.

The evidence shows that on the 15th day of September, 1906, appellant, the Illinois Steel Company, was engaged in the business of manufacturing iron and steel products at Joliet, Illinois, and was possessed of certain buildings and appliances; that, at that time, Jay D. Paige, the deceased, then twenty-four years old and unmarried, was an employee of appellant in its mixer mill. This was an iron or steel building eighty or one hundred feet east and west and fifty

or sixty north and south, with a brick floor fifteen or eighteen feet above the ground. The east half was practically oc-. cupied by the mixers, which were large iron vessels shaped like a gravy boat, twenty-five feet long and fifteen feet wide and twenty feet high, standing north and south and side by side, with a capacity of two hundred and twenty-five tons each. In front of each of the mixers was a Howe scale, and east of the east mixer was another for the cupola iron. Over the entire mill ran two electric cranes on tracks, so constructed that they could move a load in any direction. One served the east end and the other the west end of the mill. The operators of these cranes sat in cages twenty-five or thirty feet above the floor and operated them by means of levers. A runway extended from the craneman's cage to an iron platform outside the building, along which was an iron railing, and from which leading to the ground, were stairs. A steel or iron platform called the weigher's platform or mixer floor, ten or eleven feet above the main floor, extended along the south wall of the mill from the east end to within a few feet of the west end of the building. At the east end of the platform was a door or opening leading into the vessel or cupola room and a ten-foot door or opening leading into another room or building, through which access could be had down a flight of stairs to the ground. There were no openings through the south wall of the building from this platform. At the west end of the platform was a flight of stairs having a hand rail on the outside. The platform for twenty or twenty-five feet east from the stairs had a width of from four to eight feet, probably six feet, and was provided with a hand rail. It then broadened out to a width of from twelve to eighteen feet. The south end of the mixers had a nose or spout, and to make room for them to be tipped there were "V" shaped notches in the floor of the platform at this wide part. Here also in front of the nose of each mixer, was a scale beam running east and west about ten inches from the wall, and also a weight frame. The frames and beams were about four feet long and twelve inches wide. There was a hydraulic valve about three feet south and west of the nose

of each mixer, to which was attached a lever about four feet long, by which the mixer was tipped. When the mixer stood upright, this handle stood to the south, and when the mixer was tipped so its contents would run out, it stood to the north. Between the end of the lever and the scale beam and frame was a distance of about four feet. There was an opening at the west end of the building about forty feet wide and twenty or twenty-five feet high where the ladles were brought in from the blast furnaces over an elevated track of ordinary railroad gauge, called the "Tonica." There were two tracks in the west end of the mixer room for carrying the furnace ladles. The north track stopped at the west mixer, the south track ran through the mixer mill into the converter room. There was also a track from the cupolas to the east mixer, north of the other tracks, over which the ladles from the cupolas were brought in. The molten metal was brought into the mixer over the railroad tracks in ladles mounted on trucks which were drawn by an ordinary railroad engine. These ladles, holding about fifteen tons of molten metal each, standing about ten feet high on the trucks, resembled coffee cups with a spout or nose on the upper side or edge of what was always the south side as they stood on the trucks. Each ladle had upon either side round journals or trunnions about six or eight inches in diameter and fourteen inches long, which rested in the framework or saddle of the truck. There was an attachment on this saddle that caught on a lug on the journals to keep the ladles from swinging. When the ladles were on the trucks, the journals or trunnions stood east and west. In use, the ladles were picked up by the west crane by means of hooks six or eight feet long made of four by six inch steel, with the shorter end about twelve inches long, rounded at the end, and raised by means of cables attaching the hooks to the cranes. The hooks were placed on the trunnions from the north, between the ladle and the saddle of the truck, by an employee called a "hooker on." If the metal in the ladles was to be mixed, the ladles were carried by the crane to one or the other of the mixers, and there, by means of a cable from the crane, attached to a hook on the north side

of the ladle, tipped, and their contents poured into the mixer. If a "direct heat" was needed, the contents of the ladle were poured into a ladle sent out from the vessel room on the south track, and the metal went into the vessels without mixing. In taking a direct heat, owing to the fact that the ladles were pushed west of the weigher's platform where there were no scales the necessary amount of metal to be discharged into the vessel ladle was estimated by the weigher who stood on the weigher's platform, a process known as "guessing off." On the night of the accident, which occurred at about eight o'clock, Paige was engaged in determining the quantity of metal to be poured into a ladle for a direct heat. He stood on the platform eight or nine feet south and west of the ladle to be lifted. The mill was lighted by two electric arc lights, one at each end, and by incandescent lights, one at each of the scales, and four above each of the cranes. The ladle to be lifted was hooked on by Philip Jasper, the regular "hooker on," who carried an asbestos torch soaked in kerosene. When the ladle had been elevated to a height sufficient to conveniently pour its contents into the ladle from the converter, and the tipper had started and the metal begun to flow, the ladle fell or tipped to the west and its contents were spilled towards the west and southwest. Paige started to make his escape towards the west and down the stairs and was so severely burned that he died in consequence. After the metal had cooled sufficiently to afford the employees of the mill an opportunity to make an investigation, it was found that the east hook was broken and the west hook was intact.

In his opening remarks to the jury, counsel for appellee stated that, "the company had sufficient notice of the necessity of providing better light for the performance of the work." To this statement, counsel for appellant objected and the court overruled the objection, saying, "He is only stating what he is going to try to prove;" to which counsel for appellee replied, "Yes, sir, I am stating what I intend to prove and no more." To the ruling and statement of the court, counsel for appellant preserved an exception and now

urges that appellant's rights were thereby prejudiced. With this we cannot agree for the reason that if the remarks complained of savored of argument, the suggestion of the court and the reply of counsel cured any impropriety therein. Moreover, the trial court was acting within the scope of his authority in regulating the course and conduct of the argument. Elgin, Joliet & Eastern Railroad Company v. Fletcher, 128 Ill., 627.

Counsel for appellee in his closing remarks stated, "If I want the trial judge to give instructions, I prepare instructions stating the law and hand him a bunch of them and the court passes on them and refuses some and gives others. The defense does the same. I am not going to ask for any instructions. This is not a case that needs any instructions." Of the last two sentences appellant now complains, but an examination of the bill of exceptions discloses that appellant made no objection at the time to the statement of counsel. The trial court was not called upon to rule upon the propriety of the language. Whether the remarks were proper or transgressed the rule is not for our consideration, for the reason that improper remarks cannot be availed of on error unless an objection is made and exception preserved at the trial, enabling the court by proper order to counteract any prejudicial effect therefrom upon the jury. E., J. & E. R. R. Co. v. Fletcher, *supra;* Holloway v. Johnson, 129 Ill., 195; Boone v. People, 148 *id.,* 440; Pike v. City of Chicago, 155 *id.,* 656; West Chicago Street R. R. Co. v. Sullivan, 165 *id.,* 302.

The evidence shows that in taking a direct heat, the metal was not weighed but the quantity was estimated by the weigher. To do this he stood on the platform close enough to see into the ladles. When the hook slipped from the trunnions, causing the ladle to fall and its contents to spill, the room was filled with smoke, gas and flame, and the only avenues of escape were to the west down the stairs or to the east past the tipping ladle and between the mixer levers and the scale beams and frames.

Deceased fled to the west down the stairs through the flame,

and received burns from which he died. Appellant urges that he should have made his escape to the east. Reed, the weigher of the cupola iron, stood on the platform at the time, but east of the ladles and escaped to the east. He testified that deceased stood eight or nine feet southwest of the ladle to be lifted, where he could look into both ladles; that had deceased stood where he did, he could not have seen into the ladles as well; that had deceased stood on the wider part of the platform east of the ladle he might have seen into the ladles as well, but that he would have had an "awful intense heat on his eyes and himself." From the evidence we cannot say as a matter of law that in the emergency presented by the fall of the ladle which threatened injury and death, deceased should have been held to the exercise of that accurate judgment which would lead him to choose the safest avenue of escape. Under such circumstances a reasonably prudent man would undoubtedly have selected what appeared to him to be the safest course. "Persons in imminent peril are not required by law to exercise all the presence of mind and care which a prudent and careful man would exercise under ordinary circumstances." Momence Stone Co. v. Groves, 100 Ill. App., 98, judgment affirmed, 197 Ill., 88. Whether under the circumstances deceased acted as a reasonably prudent man, was a question of fact for the jury. It appears from the evidence that Jasper, the "hooker on," had but one eye, and that in adjusting the hooks to the trunnions he used an asbestos torch. Whether the electric lights and the torch furnished sufficient light for him to do the work properly, and whether he was habitually careless and physically incompetent, and whether such carelessness and physical incompetency were known to appellant, and whether appellant failed to furnish deceased with a reasonably safe place in which to work and reasonably safe avenues of escape in case of accident, were questions of fact to be determined by the jury. These they found in favor of appellee, thereby determining that the risk attending the accident to deceased was not an ordinary risk of his employment and therefore not assumed by him, and that he was at the time of the accident in

the exercise of due care for his own safety. From a careful consideration of all the evidence in the record, we cannot say that their verdict should have been otherwise.

An examination of the record shows appellant's complaints that the court improperly modified its eighth and ninth instructions and admitted improper and excluded proper testimony, to be entirely without merit.

We cannot agree with appellant in its contention that the damages are excessive. Deceased was twenty-four years old, of good health, exemplary habits and bright prospects, and the evidence shows that he had contributed to the support of his parents and their family since he was sixteen years old. His death brought upon his next of kin, particularly his father and mother who were dependent upon him, great pecuniary loss. How this loss is to be measured, in other words, what is to be the amount of the verdict, must be left to the discretion of the jury within the limits of the statute. "In creating this right of action, the legislature have confided to the jury a subject that does not lie within the limits of exact proof." Nor can we agree with counsel for appellant that the amount of the verdict was the result of sympathy on the part of the jury.

Finding no material error of law in the record, the judgment is affirmed.

*Affirmed.*

MR. JUSTICE DIBELL, having presided at the the trial of this case in the court below, took no part in its consideration here.