## A. M. Swengel, Administrator, Appellee, v. Illinois Third Vein Coal Company, Appellant.

### Gen. No. 5212.

1. CONTRIBUTORY NEGLIGENCE—*effect of sudden danger.* Persons in imminent peril are not required by law to exercise all the presence of mind and care which a prudent and careful man would exercise under ordinary circumstances.

2. MINES AND MINERS—*what constitutes common law negligence.* Held, under the evidence, that it was negligence in a mine to drive a team hauling loaded cars down a track without a light.

3. MINES AND MINERS—*what risks are assumed; what not.* Held, that a miner assumed any risk arising from meeting trains of loaded cars being hauled to the shaft at ordinary times with a light on the lead mule of the team, where there was such space between the side of the cars and the side of the roadway as the statute requires; but that he did not assume the risk that would arise from meeting a team of mules without a light on the lead mule, drawing a trip of unloaded cars at an unusual time, where there were no such places of refuge nor such a clear space between the side of the cars and the side of the roadway as required by statute.

4. INSTRUCTIONS—*directing particular verdict.* If an instruction directs a verdict for either party or amounts to such direction in case the jury should find certain facts, it must necessarily contain all the facts to authorize the verdict directed.

Action in case for death caused by alleged wrongful act.  Appeal from the Circuit Court of Bureau county; the Hon. EDGAR ELDREDGE, Judge, presiding.  Heard in this court at the April term, 1909. Reversed and remanded.  Opinion filed March 11, 1910.

**Statement by the Court.**  The Illinois Third Vein Coal Company, appellant, operated a coal mine on the long wall system, by which all the coal was removed except a block left at the shaft to support the buildings on the surface.  The mine contained two shafts, one known as the hoisting and the other as the escapement shaft.  The hoisting shaft was about four hundred feet deep, and through it the men were lowered into the mine, and the coal was hoisted.  It was separated into two compartments in which cages were operated.  Each cage had two decks, and on each, rails

were laid which would connect with the tracks laid in
the entryway, so that empty cars sent into the mine
could run from the cages to the tracks in the entry,
and loaded cars from the tracks to the cage. The bot-
tom of the shaft extending about twenty feet below
the level of the entries, was called the sump. This
was a space for the purpose, among other things, of
letting the cage down so that the upper deck would
run flush with the bottom, and that the coal falling
from the cars might find lodgment and not interfere
with the hoisting or lowering of the cage. The sump
was cleaned out each night and the coal and rock
therein were thrown into cars. One of the main en-
tries extending from the main shaft was known as the
main north or north bottom, had two tracks and ex-
tended to the north two hundred and sixty feet. One
of these tracks was called the loaded track because
after the loaded cars came from the face of the coal,
they came down this track to the shaft. The other
was called the empty track because the empty cars, as
they came from the cages into the mine, were pushed
along this track. The loaded track, for most of the
distance, was from fifteen to eighteen inches higher
than the empty track. The distance between the two
tracks was three and eight-tenths feet; the gauge of
each track was three feet and two inches, and the box
cars as they passed over the track were inside the
rails. There was a double cross-over switch called
the diamond placed near the shaft to enable cars to
be run in on both sides. Loaded cars are usually run
on the loaded tracks, and left to be run down to the
cage the next morning. During the night the sump
was cleared out, and the cars loaded from the sump
were pushed back upon the empty track to the north,
and in the morning run down to the switch to the
north of the bottom, where they were switched to the
loaded track, and then pulled by mules down to the
shaft to be hoisted. It was the custom to have a light
on the lead mule of the team or trip. The men usually

went down into the mine from six-thirty to seven in the morning. As a rule their tools were left in the mine but occasionally the men left them outside, and in such case, their tools were not taken into the mine until the miners had gone down and the seven o'clock whistle had blown for work, and then they were taken down in the first empty car. The men remained at the shaft until they received them, and so left the bottom after work had commenced. On the morning of April 15, 1907, there were, on the loaded track, some fifteen or twenty loaded cars. In order to put them on the cage there was a man standing north of the cage, called the cager. The loaded track was on an incline, so that cars when hauled to a certain point, would run down of their own weight. Their descent was controlled by two boys called spraggers. The loaded cars were hauled to one spragger by mules, and let down by him to the other spragger who let them down to the shaft. Ricardo Milani went into the mine at the usual time that morning, but for some reason left his tools outside, and was obliged to wait until they came down before going to his working place. From seven to ten minutes after seven o'clock, after Milani obtained the tools, he started from the shaft north to his working place with three other miners walking between the tracks, Milani in the lead. When they had gone some distance, they heard the crack of a driver's whip ahead, and knew that a trip was coming. Cramer, the driver of the trip, saw the lights on their caps and hollered to them to get out of the way. Two of the miners jumped into some empty cars on the track, and the other ran back about twenty or thirty feet, and none of them were harmed. Milani stepped upon the loaded track in front of the trip and attempted to pass the mules, and did pass about three of them, when they started to run and he was knocked down, run over and killed. Appellee, as administrator of his estate, brought this suit in the Circuit Court of Bureau county to recover damages suffered by his

widow and children as the result of his death. The declaration consisted of three original and three additional counts, all charging a common law liability, on the theory that it was the duty of the company to furnish deceased with a safe place in which to work, and a safe place over which to travel to and from his work. The second original and the second and third additional counts also alleged a failure to provide places of refuge along the roadway over which deceased had to travel. All the counts alleged that deceased came to his death as a result of the negligence of servants of. the company, not his fellow-servants. It was also alleged that deceased was in the exercise of reasonable care for his own safety, and that he left him surviving a widow and three minor children, as his heirs at law and descendants. There was a plea of not guilty, and a verdict and a judgment for the administrator for $2,500 and the company prosecutes this appeal.

McDOUGALL, CHAPMAN & BAYNE, for appellant.

J. L. MURPHY and WILLIAM HAWTHORNE, for appellee.

MR. JUSTICE WILLIS delivered the opinion of the court.

It is urged that Milani was guilty of negligence in taking the side of the loaded track. The proof warrants the conclusion that Milani and his companions had no reason to expect that they would meet loaded cars being drawn toward the shaft at that time in the morning, and the evidence tends to show that the empty track was blocked with empties at the point where he first discovered the lead mule, and that the lead mule did not have a light on his head as was customary. Milani could not see the team coming as he would have done had there been a light on the lead mule, and it is entirely possible, from the evidence,

and perhaps even probable, that as he heard these mules coming he supposed they were mules coming to the mouth of the shaft to haul out the empties, and not a team hauling loaded cars. If this were true he would have been safe on either side, off the space between the tracks. In this situation, he was confronted by sudden danger and not called upon to exercise that degree of care and foresight which would have been required of him had there been time for reflection. Under such circumstances a reasonably prudent man would undoubtedly have selected what appeared to him to be the safest course. "Persons in imminent peril are not required by law to exercise all the presence of mind and care which a prudent and careful man would exercise under ordinary circumstances." Momence Stone Co. v. Groves, 100 Ill. App. 98, 197 Ill. 88; Paige v. Illinois Steel Co., 136 Ill. App. 410, 233 Ill. 313. The proof shows that the driver of these mules while on his way towards the shaft to haul back empties, was met by a team hauling some empties out on the other track and some cars which had been loaded during the night in cleaning the sump. The assistant driver boss was driving the train which was going into the face of the mine, and when he saw this driver coming towards the shaft with his mules, he told him to come above the switch where he intended to leave his loaded cars, and haul them back upon the loaded track towards the shaft, and it was while these loaded cars were being hauled toward the shaft that Milani and his companions met the mules drawing them, traveling between the two tracks with no light displayed on the lead mule. It was a question of fact for the jury whether, under the facts and circumstances in proof, Milani was exercising due care, and in determining that question, and whether appellant was negligent, they had a right to consider not only the evidence offered in support of the averments in the declaration of a common law liability, but also that offered in support of the averments that places of ref-

uge were not provided along the roadway which Milani had to travel in going to his work. The proof clearly warrants the conclusion that it was negligence to drive the team hauling the loaded cars down the track without a light. The evidence left it doubtful whether the space on the outside of these tracks on either side of this way, was, in the absence of places of refuge, of the depth required by the Mines and Miners Act. If not, then the omission to supply places of refuge was a violation of the requirements of the act. As Milani had a right to depend upon appellant's compliance with the requirements of the statute, we are of the opinion that on the question of Milani's care and appellant's negligence the verdict is sustained by the evidence.

Much of the proof that supports the finding that deceased was not guilty of negligence, and that appellant was, must be considered in determining whether Milani's death was caused by a risk which he assumed or by a risk not incident to his employment. He did assume any risk arising from meeting trains of loaded cars being hauled to the shaft at ordinary times with a light on the lead mule of the team, where there was such space between the side of the cars and the side of the roadway as the statute requires; but he did not assume the risk that would arise from meeting a team of mules without a light on the lead mule, drawing a trip of loaded cars at an unusual time, where there were no such places of refuge nor such a clear space between the side of the cars and the side of the roadway as required by the statute.

Appellant urges that the giving of the third instruction for appellee amounts to reversible error, since it wholly ignored the doctrine of assumed risk. By this instruction the jury were told that it was the duty of appellant to furnish Milani a reasonably safe route to and from his working place and that if the jury believed that appellant "failed so to do as alleged in the

declaration'' and that, by reason thereof, Milani, while exercising ordinary care for his own safety, lost his life, appellee was entitled to recover. The third original and the second additional counts of the declaration expressly negative Milani's assumption of the risk. The first and second original and third additional counts contain no averments expressly negativing such assumption, and it is doubtful if such a negation can be implied, as urged by counsel for appellee, from any of the averments therein except in the first original count. Counsel practically admit that the first additional count does not preclude the doctrine of assumed risk, but argue that as it is ''only one-sixth of the declaration,'' the instruction should not be held as reversible error on that account, as it was warranted by most of the declaration; and that this court cannot say that the jury decided the case on this particular count. This was a peremptory instruction directing a verdict; and if an instruction directs a verdict for either party, or amounts to such direction in case the jury shall find certain facts, it must necessarily contain all the facts which will authorize the verdict directed. Lake Erie & Western Railroad Co. v. Wilson, 189 Ill. 89; Illinois Central Railroad Co. v. Smith, 208 Ill. 608; Montgomery Coal Co. v. Barringer, 218 Ill. 327. The jury if they followed this instruction, might have found the averments of the counts of the declaration which did not negative the assumption of the risk of his employment by deceased, to have been fully established by the evidence and based their verdict thereon, although they believed that it was not shown by the evidence that deceased did not assume the risk by which he met his death. In the absence of a negation of the assumption of the risk of his employment by deceased, in each and every count of the declaration, we hold that the giving of the instruction constituted reversible error, and that the error was not cured by instructions given on be-

half of appellant. Herdman Harrison Milling Co. v. Spehr, 145 Ill. 329; Illinois Central Railroad Co. v. Smith, *supra;* Terra Cotta Lumber Co. v. Hanley, 214 Ill. 243; Montgomery Coal Co. v. Barringer, *supra.*

The judgment is therefore reversed and the cause remanded.

*Reversed and remanded.*